FRONTLINE COMMUNICATIONS
INTERNATIONAL, INC.,
Plaintiff,

v.

SPRINT COMMUNICATIONS
COMPANY L.P., Defendant
and Third Party Plaintiff,

v.

Melvin COOPER, David Bersson, Norman Bersson, Earl G. Thompson and Erik Gardiner, Third Party Defendants.

International Telnet, Inc., Plaintiff,

v.

Sprint Communications Company
L.P., Defendant and Third
Party Plaintiff,

v.

Melvin Cooper, David Bersson, Norman Bersson, Earl G. Thompson and Erik Gardiner, Third Party Defendants.

Emkay Holdings Management,
Inc., Plaintiff,

v.

Sprint Communications Company
L.P., Defendant and Third
Party Plaintiff,

v.

Melvin Cooper, David Bersson, Norman Bersson, Earl G. Thompson and Erik Gardiner, Third Party Defendants.

Acme Consolidated, Inc., Plaintiff,

v.

Sprint Communications Company
L.P., Defendant and Third
Party Plaintiff,

v.

Melvin Cooper, David Bersson, Norman Bersson, Earl G. Thompson and Erik Gardiner, Third Party Defendants.

Caribe Direct, Inc. and Bellrose Gem

Corporation, Plaintiffs,

v.

Sprint Communications Company
L.P., Defendant and Third
Party Plaintiff,

v.

Melvin Cooper, David Bersson, Norman Bersson, Earl G. Thompson and Erik Gardiner, Third Party Defendants.

Nos. 01 Civ. 8890(MGC), 01 Civ. 8963(MGC), 01 Civ. 9259(MGC), 01 Civ. 9261(MGC), 01 Civ. 9430(MGC).

United States District Court,
S.D. New York.

Dec. 28, 2001.

Swidler Berlin Shereff Friedman, LLP (by Adam J. Wasserman), New York City, for Plaintiffs Frontline International, Inc., Acme Consolidated, Inc., Caribe Direct, Inc. and Bellrose Gem Corp.

Swidler Berlin Shereff Friedman, LLP (by C. Joel Van Over, Michael C. Sloan), Washington, DC, for Plaintiffs Frontline International, Inc., Acme Consolidated, Inc., Caribe Direct, Inc. and Bellrose Gem Corp.

Tague & Van Heuvel LLP (by John F. Tague, III), Bronxville, NY, for Plaintiffs Emkay Holdings Management, Inc. and International Telnet, Inc.

Graubard Miller (by Edward H. Pomeranz, Patrick E. Cox), New York City, for Plaintiffs Acme Consolidated, Inc., Caribe Direct, Inc. and Bellrose Gem Corp.

Anderson Kill & Olick, P.C. (by Steven Cooper, Jordan W. Siev), New York City, for Defendant.

Willkie Farr & Gallagher (by David P. Murray, Randy J. Branitsky), Washington, DC, for Defendant.

*OPINION*

CEDARBAUM, District Judge.

These cases arise out of conflicting interpretations of a contract for the provision of international telecommunications services, and the monthly charges billed to plaintiff by defendant for September and October of 2001. Until recently, interstate providers of telecommunications services were required to file "schedules," or "tariffs," with the Federal Communications Commission ("F.C.C."), listing all charges for interstate and foreign ser-

vices. 47 U.S.C. § 203(c). Common carriers could not charge rates that differed from the rates in their tariffs. 47 U.S.C. § 203(a); *AT & T v. Cent. Office Tel.*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998). On February 5, 2001, the F.C.C. issued public notice that all domestic tariffs must be cancelled by August 1, 2001. *Common Carrier Bureau Extends Transition Period for Detariffing Consumer Domestic Long Distance Services*, 16 F.C.C. Rcd. 2906 (2001). On March 20, 2001, the F.C.C. ordered the withdrawal and cancellation of all international tariffs by January 20, 2002. *Policy and Rules Concerning the International, Interexchange Marketplace*, FCC Docket No. 01–93, at ¶ 9 (2001).

It is in this context that the current dispute arose. The contracts at issue were executed during the period when defendant, like all other common carriers, was required to file tariffs with the F.C.C. The present dispute arose, however, after defendant withdrew and thus cancelled its domestic and international tariffs on Augsut 1, 2001, pursuant to the F.C.C.'s orders. Although the parties make several arguments based on federal law, resolution of the dispute between the parties requires the interpretation of the contracts at issue.

In these actions, six resellers of telephone services, Frontline Communications, International, Inc. ("Frontline"), Acme Consolidated, Inc. ("Acme"), Caribe Direct, Inc. ("Caribe"), Bellrose Gem Corporation ("Bellrose"), Emkay Holdings Management, Inc. ("Emkay"), and International Telnet, Inc. ("Telnet"), sue their supplier, Sprint Communications Company, L.P. ("Sprint"), for breach of contract, and seek declaratory and injunctive relief, as well as damages. Frontline, Emkay, and Telnet also assert violations of the Communications Act of 1934, 47 U.S.C. § 151, *et seq.* (the "Communications Act").

Sprint asserts counterclaims against five of the plaintiffs for breach of contract, fraud, conspiracy to defraud, and fraud in the inducement, and seeks rescission and damages. Sprint has also impleaded five individuals.

Originally, plaintiffs sought temporary restraining orders and preliminary injunctions to prevent Sprint from cutting off service. After expedited discovery, plaintiffs now seek partial summary judgment in the form of a declaration construing the contract for "fixed rates" as prohibiting additional charges for usage labeled by defendant as "surcharges." For the reasons that follow, plaintiffs' motion is granted.

## BACKGROUND

The facts relevant to plaintiffs' motion are undisputed. Sprint is a provider of telecommunications services within the meaning of the Communications Act. Plaintiffs, all resellers of telecommunications services, entered into supply contracts with Sprint. Frontline entered into a one-year contract with Sprint on August 18, 2000, and executed an amendment on March 20, 2001 to extend the term to March 20, 2002. The original Bellrose one-year contract was executed on November 28, 2000, and amended on May 17, 2001 to extend its term to May 17, 2002. Acme entered into a two-year contract on December 19, 2000, which was amended on July 26, 2001. International Telnet entered into a one-year contract on April 11, 2001. Emkay entered into a three-year contract on April 25, 2001. Caribe entered into a one year contract, which by its terms expired on November 1, 2001. Caribe has not produced any evidence of an extension.

These contracts were all filed with the F.C.C. as contract tariffs. The contracts are form contracts drafted by Sprint, and

are identical in all material respects. Therefore, references to contract provisions are to provisions of the contract between Frontline and Sprint unless otherwise specified.

Each of the contracts is entitled "Custom Service Agreement" ("CSA"), and is divided into two sections: a section containing "custom provisions" and a section entitled "standard provisions." In custom provision No. 2, Sprint agrees to provide a service entitled "Sprint Real Solutions Annual Outbound." The terms of this service are contained in custom provision No. 6:

A. Sprint will charge Customer the Net Effective Usage Rates equivalent to the Sprint Real Solutions Annual, 1 Year Term, $240,000 level on its interstate, intrastate and international and international Sprint Real Solutions Annual Service Usage Charges, except as stated in this Agreement.

B. Sprint will charge Customer a fixed Net Effective Usage Rate in the applicable amount from the table below for its International (Domestic Origination) Sprint Real Solutions Annual Outbound ... Service Usage Charges to the following countries.

| Country | Per Minute Dedicated | Switched |
|---|---|---|
| Australia | $0.0500 | $0.0700 |
| Austria | $0.0800 | $0.1000 |
| Belgium | $0.0625 | $0.0850 |
| France | $0.0520 | $0.0720 |
| Germany | $0.0500 | $0.0700 |
| Netherlands | $0.0500 | $0.0700 |
| Norway | $0.0590 | $0.0790 |
| Spain | $0.0660 | $0.0860 |
| United Kingdom | $0.0500 | $0.0700 |

Following the custom provisions are eleven standard provisions. Three are the focus of the dispute in these actions:

1. **Tariff Applicability.** All terms and conditions in Sprint FCC Tariff No. 12 apply to this Agreement. Capitalized terms are defined in this Agreement or in Sprint FCC Tariff No. 12. This Agreement's rates, charges and Discounts supersede any promotions or discounts that are available under Sprint's tariffs. Rates, charges and Discounts for call types, Service elements, features, and Services not in this Agreement are in the applicable Sprint Base Service Tariff or public price list.

2. **Fixed Rates.** Fixed rates will remain fixed for the Term. Percentage Discounts will remain fixed for the Term, but Sprint may modify the underlying tariff rate (or list price for non-tariffed Services) against which Sprint applies Discounts.

3. **Tariff Withdrawal.** If Sprint withdraws any tariff that applies to Services in this Agreement, the tariff terms and conditions then in effect will continue to apply to this Agreement. After Sprint withdraws any applicable tariff, this Agreement will control over any inconsistent provision in the withdrawn tariff. But Sprint may modify any tariff rate or list price that is not fixed by this Agreement.

Sprint's F.C.C. Tariff 12 defines the term "Net Effective Usage Rate," which is used in custom provision No. 6. Until February 17, 2001, Tariff 12 defined Net Effective Usage Rate, in part, as follows:

*Net effective Usage Rate or Net Effective Rate:* Net effective usage rate or net effective rate is the effective rate which a customer will pay for a Service or Service element under the customer's CNSA, after the application of charges, surcharges, credits, discounts and any other price (and discount) related adjustments which apply to that individual Service or Service element. . . .

*Tariff 12*, § 2.1, 2d Revised Page 21 (effective January 12, 1996).

Effective February 17, 2001, Sprint revised the definition of Net Effective Usage

Rate to exclude "surcharges" and a variety of other charges:

> *Net effective Usage Rate or Net Effective Rate:* Net effective usage rate or net effective rate is the effective rate which a customer will pay for a Service or Service element under the customer's CNSA for Usage Charges, after the application of credits, discounts and any other price (and discount) related adjustments which apply to that individual Service or Service element.... Net Effective Usage Rate or Net Effective Rate only includes usage charges and does not include charges such as nonrecurring charges, monthly recurring charges, surcharges and taxes.

*Tariff 12,* § 2.1, 3d Revised Page 21 (effective February 17, 2001).

Additionally, Tariff 12 states that the "underlying switched and dedicated Network Services included within a CNSA are furnished under this tariff and Sprint's Tariff F.C.C. Nos. 1, 2, 5, 6, 7, 8, 10 and 11 as referenced herein." *Tariff 12,* § 1.1, Original Page 6 (effective March 7, 1995). Tariff 11 governs international services, including those ordered by Plaintiffs. Effective June 1, 2001, Sprint amended Tariff 11 to include, for the first time, an "International Mobile Termination Surcharge" (the "surcharge") for calls "terminating in the non-U.S. countries or areas listed ... to a mobile or like service...." *Tariff 11,* 4th Revised Page 38 (effective June 1, 2001). The amendment to Tariff 11 includes a table listing the amount of the surcharge for each minute of mobile usage to a particular country. *Id.* Sprint imposed the surcharge after foreign carriers began to impose a nearly identical surcharge on Sprint for international calls terminating to mobile phones.

On August 1, 2001, Sprint withdrew all of its domestic and international tariffs pursuant to the F.C.C.'s orders. In its bills to plaintiffs for September of 2001, for the first time, Sprint amended plaintiffs' usage charges to include the surcharge. The surcharge was not identified separately, but was simply added to plaintiffs' "total usage charges."

## DISCUSSION

### Summary Judgment

When there are no material facts in dispute, a motion for summary judgment should be granted. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether a genuine issue exists, a court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *In re Chateaugay Corp.,* 10 F.3d 944, 957 (2d Cir.1993).

### Contract Interpretation

 The parties all agree that New York law applies to the interpretation of the contracts. Under New York law, a contract must be interpreted in accordance with the intent of the parties as revealed by the language and structure of the contract, *Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 413 N.Y.S.2d 352 (N.Y.1978), giving terms their plain meaning. *Laba v. Carey,* 29 N.Y.2d 302, 308, 277 N.E.2d 641, 327 N.Y.S.2d 613 (N.Y.1971). Moreover, the contract must be interpreted so as to give meaning to every provision. *Id.; Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 46, 133 N.E.2d 688, 150 N.Y.S.2d 171 (N.Y.

1956); *Reda v. Eastman Kodak Co.*, 233 A.D.2d 914, 649 N.Y.S.2d 555, 557 (4th Dept.1996). The parties agree that the terms of the contract are unambiguous, and that its interpretation is a matter of law for the court.

■ Standard provision No. 1 of the CSA states that "[a]ll terms and conditions in Sprint FCC Tariff No. 12 apply to this Agreement. Capitalized terms are defined in this Agreement or in Sprint FCC Tariff No. 12." As noted above, Sprint withdrew all of its tariffs on August 1, 2001. Standard provision No. 3 of the CSA, which explicitly addresses tariff withdrawal, provides that after withdrawal, the CSA "will control over any inconsistent provision in the withdrawn tariff."

Plaintiffs contend that Sprint's amended definition of the term "Net Effective Usage Rate" is inconsistent with the CSA. In support of their position, plaintiffs rely on standard provision No. 2, which promises that "[f]ixed rates will remain fixed for the Term." They also point to the language of custom provision No. 6(b), which states that "Sprint will charge Customer a fixed Net Effective Usage Rate in the applicable amount from the table below...." According to plaintiffs, standard provision No. 2 requires that the amount charged in custom provision No. 6(b) be fixed for the term of the CSA.

Sprint responds that the amendment to Tariff 12 became effective before any of the plaintiffs executed either their original CSA or a later amended agreement. Thus, Sprint argues, no provision in Tariff 12 can be "inconsistent" with the CSA because the tariff, as amended, was incorporated into the CSA. However, Sprint's argument is contradicted by standard provision No. 3. That provision does not distinguish between tariffs incorporated into the contract and tariffs not incorporated. It refers to "any tariff that applies to

Services in this Agreement...." The only tariffs that apply to "Services in this Agreement" are Tariff 12 and Tariff 11. Moreover, standard provision No. 3 distinguishes between tariffs and the "Agreement" that those tariffs apply to, a distinction that would be meaningless if incorporated tariffs were part of the "Agreement" for purposes of standard provision No. 3.

Sprint also argues that the "fixed rates" referred to in custom provision No. 6(b) are the fixed "Net Effective Usage" rates, and that Sprint may define that term in Tariff 12 to exclude whatever Sprint labels a "surcharge." In support of this argument, Sprint points to standard provision No. 1, which notes that "[c]apitalized Terms are defined in this Agreement or in Sprint FCC Tariff No. 12."

Although the capitalized term "Net Effective Usage Rate" is defined in Tariff 12, the common word "rates" in standard provision No. 2 is not capitalized and is not defined. The word "rate," as used in the phrase "fixed rates will remain fixed for the term," is commonly understood to mean the amount of one item in relation to the amount of another item. *See, e.g.*, *Oxford English Dictionary* Vol. 13, at 208 (2d ed.1989). In the CSA, the "rate" that is fixed is the relationship between amount of usage of Sprint's service and price. The service is the "Sprint Real Solutions Annual Outbound" plan noted in custom provision No. 6(b). The price is listed in custom provision No. 6(b) as a fixed per-minute charge.

Although Sprint has called its increase a "surcharge," Sprint's own description of the "surcharge" shows it to be a rate increase based on usage and prohibited by the CSA. In Tariff 11, Sprint describes the surcharge as a "flat, non-distance, non-time-of-day sensitive per six-second rate

which varies by country." *Tariff 11,* § 2.13, 2d Revised Page 38 (effective June 1, 2001). Sprint then lists a per-minute usage charge for each country affected by the surcharge, identical in form to the per-minute usage charge contained in custom provision 6(b) of the CSA. Moreover, the bills sent to plaintiffs by Sprint do not identify or separate the "surcharge," but simply increase the amount of the item labeled "total usage charges." Thus, the "surcharge" increases the per-minute contract rates that plaintiffs are charged for service usage, a result inconsistent with Sprint's promise that "fixed rates will remain fixed."

A reading of the entire CSA supports the same conclusion. The interpretation of a particular provision must give force and effect to all the provisions of the CSA. Sprint argues that it is entitled to change the underlying definition of Net Effective Usage Rate. Under such a theory, Sprint could exclude any additional charge for usage from the definition of Net Effective Usage Rate simply by calling the charge a "surcharge." Sprint's construction of the CSA would render standard provision No. 2 and custom provision No. 6(b) meaningless.

Standard provision No. 5 is also difficult to harmonize with Sprint's reading of the CSA. That provision states in part:

> **5. Regulatory Programs.** Sprint may impose additional charges on Customer to recover amounts Sprint is required by regulatory or other governmental authorities to collect on behalf of or pay to others in support of statutory or regulatory programs, plus associated administrative costs.

Defendant's argument that it is entitled to change the underlying definition of Net Effective Usage Rate would make it unnecessary to reserve the right to "impose additional charges" elsewhere in the CSA.

A higher rate may come in the form of an increase in a charge paid for a particular service or the imposition of an additional charge for that service. Here, defendant has attempted to do the latter. The result is an increase in the usage rate charged to plaintiffs in violation of the terms of the CSA.

*The Filed Tariff Doctrine*

■ Sprint also argues that the "filed tariff doctrine" bars plaintiffs' claims even after withdrawal of all of its tariffs. Under the filed tariff doctrine, a tariff filed by a carrier with the F.C.C. controls the relationship between the carrier and its customers. *See Cent. Office Tel.,* 524 U.S. at 222, 118 S.Ct. 1956; *MCI Telecom. Corp. v. AT & T,* 512 U.S. 218, 229–31, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994). Thus, "even if a carrier intentionally misrepresent[ed] its rate and a customer relie[d] on the misrepresentation, the carrier [could not] be held to the promised rate if it conflict[ed] with the published tariff." *Cent. Office Tel.,* 524 U.S. at 222, 118 S.Ct. 1956. Plaintiffs do not deny that the filed tariff doctrine, if it applied here, would preclude their claims for breach of contract.

However, Sprint's contention that the filed tariff doctrine bars plaintiffs' claims after withdrawal of Sprint's tariffs is not persuasive. The filed tariff doctrine does not exist in isolation from the regulatory scheme it was intended to further. After August 1, 2001, when Sprint's tariffs were withdrawn, the tariffs ceased to have the force of federal law, and became simply documents referred to in the CSA, subject to the common law rules of contract interpretation.

The remaining arguments of the parties lack merit because they do not assist in interpreting the plain language of the CSA after tariff withdrawal. For example, defendant explains at some length that it is

merely passing on a surcharge that foreign carriers imposed on all mobile phone calls terminating in foreign countries. The reason for imposing the surcharge, however, does not change the fact that the surcharge defendant has imposed constitutes a rate increase.

As a fallback position, plaintiffs assert that Sprint also violated the Communications Act. Because the amendments violate the express terms of the CSA, it is unnecessary to address plaintiffs' argument.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment is granted. The agreements between the parties fix the usage rates and prohibit additional charges based solely on usage.

SO ORDERED.